IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THERESA ASHWORTH, individually and as Executrix of the Estate of James Ashworth<br><br>Plaintiff,<br><br>v.<br><br>ROUND LAKE BEACH POLICE DEPARTMENT, OFFICER PAUL GRACE, and OFFICER DAVID DOWDLE,<br><br>Defendants. | No. 03C7011<br>Paul E. Plunkett, Senior Judge |

## MEMORANDUM OPINION AND ORDER

Theresa Ashworth ("Plaintiff"), as executrix of the estate of James Ashworth ("James"), has sued the Round Lake Beach Police Department, and Officers Paul Grace and David Dowdle (collectively, "Defendants") for violating James's constitutional rights when the officers arrested James. Plaintiff alleges that the officers used excessive force and acted with deliberate indifference when they fastened James's handcuffs too tightly and left the handcuffs on even when James began having trouble breathing. Plaintiffs also charge that the officers were willful and wanton and violated James's statutory civil rights. Defendants have filed a Federal Rule of Civil Procedure 56(c) motion for summary judgment on the. For the reasons set forth below, the motion is granted in part and denied in part.

### Factual Background

On April 8, 2003, James Ashworth and his son Eric went to a Dominick's in Round Lake

Beach because James wanted to cash a check at the bank inside the store. The bank teller refused to cash the check, sparking an argument between the teller and James. After a brief confrontation, the bank manager asked the Ashworths to leave the store. They obliged. Two officers were dispatched to the area, with word of a suspicious subject.

There is some dispute about what happened next. According to Officer Grace, who first arrived on the scene, Eric started to drive off somewhat erratically in a blue minivan with James in the passenger seat. When Grace asked Eric to shut off the car, James responded that they would not. Grace asked the men what happened in the store. James used several vulgarities in explaining that the bank would not cash his check. He got out of the car to show the officer the check. Grace asked James who the signatory of the check was but James refused to answer the question. During this exchange, Grace asked James to take his hands out of his pockets several times but James would not. Finally, Grace asked James for identification. James did not have any but was able to supply his driver's license number.

According to Eric's deposition testimony, Grace's only request was for James's driver's license. James explained that he did not have any with him, which was what had caused the problem at the bank. When the officer asked him whether he had any other form of identification with him, James got out of the van and began to check the pockets of his coat. As he did so, the officer told him several times to take his hands out of his pockets. Grace then told James he could get back in the van. James refused to do so, at which point Grace placed him under arrest.

Meanwhile, the second officer, Dowdle, went into the store to interview bank employees about what had happened. He then joined Grace in arresting James. James was told to put his hands behind his back and he complied. There is no dispute that James did not make any attempt to resist

arrest. The officers maintain that they used two sets of handcuffs because, at 6 feet tall and 270 pounds, James was too large for only one set. According to Eric's deposition testimony and affidavit, however, Eric observed the officers using one set of handcuffs. The coroner's report states that light markings from the handcuffs were still visible on James's body during an autopsy conducted twenty hours after his death.

James was placed in the back seat of Grace's squad car as the officers went inside the store to collect more information. Dowdle came out of the store, told Eric to get out of the van, handcuffed him and placed him in the back seat of Dowdle's squad car, parked directly behind Grace's. Eric testified he could see his father moving his shoulders up and down as though he was having trouble breathing. He says he screamed for someone to help his father. The squad car windows were all closed except one of the front windows, which was open about two inches. He then saw his father slump over. He testified some time elapsed—he could not say how much time—before Grace exited the squad car in order to check on James. Eric could hear Grace asking James if he was okay. He was able to hear via Dowdle's squad car radio that Grace called for an ambulance. Within two to five minutes, an ambulance arrived. When they did, one of the paramedics testified, the squad car doors were closed and Grace was standing outside of the vehicle. According to Eric, the paramedics began pulling James out of the car, yelling at Grace to take the handcuffs off of him. By this time, James already appeared "cyanotic," or blue, as though he was not breathing.

The paramedics attempted to revive James, but he did not survive. According to an autopsy done on James's body, he died of cardiac arrhythmia due to arteriosclerotic cardiovascular disease. Plaintiff's expert, a cardiologist, testified that James died from asphyxiation caused by having his

hands handcuffed behind him.

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Discussion

*Municipal Liability*

Defendants ask us to dismiss all claims against the Round Lake Beach Police Department because it is not a suable entity. We agree that is more than likely the case. *See West v. Wagmire*, 114 F.3d 646, 647 (7th Cir.1997); *Williams v. Hutchens*, 870 F.Supp. 857 (N.D. Ill. 1994) (holding that where police department is merely an organizational division of a municipality, the department enjoys no separate legal existence).

However, even if Plaintiff had correctly named the Village of Round Lake Beach as a Defendant, the claims against the Village would be dropped. To prevail on a 42 U.S.C. §1983 claim against the Village, plaintiff must show that he was deprived of his constitutional rights pursuant to

one of its policies, customs or practices. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, the plaintiff must show the injury was caused by "(1) the enforcement of an express policy of the [municipality], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001).

Plaintiff argues that the police department had a policy requiring its officers to handcuff all detainees behind their backs regardless of the circumstances. There is no evidence that the Village had an express policy of that kind. To show custom, Plaintiff points to testimony elicited from Grace during a deposition. The officer says that he does not recall whether he was trained to refrain from using handcuffs where the physical health of the detainee might be jeopardized. (Defs.' L.R. 56.1 Stmt. Ex. C at 77.) He does say that his instruction taught him to always restrain arrestees with their hands behind their backs, rather than with their hands in front. (*Id.* at 78.) The Court would have to take too far an inferential leap to allow this to stand as evidence that the police department had an established custom. However, even had there been such a custom, it would not be material to this case. As will be discussed more fully below, there is no indication that handcuffing James behind his back led to his death. Therefore, the Village is not liable for this claim.

Next, Plaintiff argues that the Village is liable for its failure to train its police officers to avoid arrest procedures that could potentially result in "positional asphyxiation."[1] The Supreme Court has found that "the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom

---

[1] Positional asphyxia is death caused by suffocation when a person's chest movement is restricted and postural obstruction of the airway occurs.

the police come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989). "[A] municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation." *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003). The municipality must have actual or constructive notice that the recurring situation could result in constitutional violations. *Ross v. Town of Austin*, 343 F.3d 915, 918 (7th Cir. 2003).

Here, there is no evidence that prior to April 8, 2003, any detainee had died from positional asphyxia while in the custody of the Round Lake Beach Police Department. Nor is there any admissible evidence that there was a growing awareness of its dangers, as Plaintiff asserts. Federal Rule of Civil Procedure 56(e) requires that evidence considered. "When a party seeks to offer evidence through [exhibits other than depositions, answers to interrogatories, admissions and affidavits], they must be identified by affidavit or otherwise made admissible in evidence. *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir.1985).

In an effort to show that there was a growing awareness of positional asphyxia among police departments, Plaintiff has provided the Court with two training outlines purportedly used by the College of Lake County Criminal Justice Institute (Pl.'s L.R. 56.1 Ex. 15.) and the Chicago Police Department. (*Id.* Ex. 14.) Neither is accompanied by an affidavit, but the former does come with a cover letter from an administrator from the College of Lake County who presumably has some knowledge that the contents of the documents are what they purport to be. Even if this were sufficient to authenticate the materials, the letter does not adequately describe the outline that follows, so there is no evidence that one relates to the other. The second document does not come directly from the Chicago Police Department, but instead comes from the Chicago Reporter website,

by way of another website, www.charlymiller.com. *See In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp.2d 769, 782 (C.D. Cal. 2004) ("Printouts from a web site do not bear the indicia of reliability demanded for other self-authenticating documents under Fed.R.Evid. 902."). Therefore we will not consider either document.

Without any evidence that positional asphyxiation was a recurring situation in the Village of Round Lake Beach Police Department or that the Village knew or should have known of the potential for constitutional violation, we cannot find the municipality was deliberately indifferent to its risks. Therefore, we find it cannot be held liable for failure to properly train its officers. Summary judgment in favor of the Village is granted.

*Qualified Immunity*

Defendants also argue that the claims against Grace and Dowdle should not move forward because they are protected by qualified immunity. Government officials performing discretionary functions have qualified immunity from civil damages as long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982). The purpose of qualified immunity is to shield public officers from liability resulting from either a change in law after they acted, or enduring legal uncertainty that makes it difficult for the officer to assess the lawfulness of the act in question before he does it. *Ralston v. McGovern*, 167 F.3d 1160, 1161 (7th Cir. 1999). The plaintiff bears the burden of showing that the statutory or constitutional right has been clearly established. "To show this, a plaintiff may point to closely analogous cases establishing that the conduct is unlawful, or demonstrate that the violation is so obvious that a reasonable state actor would know that what

he is doing violates the Constitution." *Morrell v. Mock*, 270 F.3d 1090, 1100 (7th Cir.2001).

The Court engages in a two-part test to determine whether qualified immunity applies. First, the Court must determine "whether the plaintiff has asserted a violation of a federal constitutional right." *Spiegel v. Cortese*, 196 F.3d 717, 722 (7th Cir. 1999). Second, we determine "whether the constitutional standards implicated were clearly established at the time in question." *Id*. Here, Plaintiff claims that the officers used excessive force in arresting James and were deliberately indifferent to his medical needs once they noticed he was having difficulty breathing. We will examine each claim in turn.

Excessive Force

Plaintiff maintains that Grace and Dowdle used excessive force in handcuffing James, an obese man, with his hands behind his back, and later for leaving his handcuffs on after he exhibited signs that he was having trouble breathing. "[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). In order to determine whether a police officer used excessive force, the court must examine whether, "judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Id.* at 396. Determinations of reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The analysis is highly fact specific, and should include consideration of "the severity of the crime

at issue, whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The mere allegation that handcuffs were fastened too tightly in an arrest that is otherwise properly effectuated is not sufficient to support an excessive force claim. *Braun v. Baldwin*, 346 F.3d 761, 763 (7th Cir. 2003). Here, Plaintiff suggests that Grace acted improperly by handcuffing a compliant James, knowing that James had a medical condition. Plaintiff relies on two cases in which an issue of material fact regarding excessive force was sucessfully raised, *Pritzker v. City of Hudson*, 26 F. Supp. 2d 433, 444 (N.D.N.Y. 1998) and *Aceto v. Katchajian*, 240 F. Supp. 2d 121, 125 (D. Mass. 2003), to support her argument. In *Pritzker*, the plaintiff warned the arresting officers that his wrists had been injured previously and therefore the handcuffs should not be fastened too tightly. *Pritzker*, 26 F. Supp. 2d at 444. In *Aceto*, the plaintiff asked officers to handcuff her with her hands in front of her because she had an injured shoulder. Both cases also reference a list of similar cases, including *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir.1998) (viable excessive force claim where arrestee's arm was in a sling before being handcuffed); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir.1993) ("An excessive use of force claim could be premised on [the] Officer['s] handcuffing [plaintiff] if he knew that she had an injured arm and if he believed that she posed no threat to him."); *Howard v. Dickerson*, 34 F.3d 978, 981 (10th Cir.1994) (material issue found where officers handcuffed plaintiff despite knowing that plaintiff had recently undergone neck surgery).

These cases do not hold that handcuffing an arrestee with *any* known medical condition is excessive force. Rather, in each case the injury involved is one that could be exacerbated by the application of handcuffs behind the back. In the case at bar, Plaintiff has produced virtually no evidence that the officers knew that James had a medical condition. Buried within Eric's deposition

testimony is the contention that James told the officers that he was sick and needed his medication. There is no indication that the officers, or even Eric, knew at the time what kind of medication was needed. (Defs.' L.R. 56.1, Ex. D at 57; 70–71.) Nor is there any information in the record presently before the Court that heart disease, the medical condition James suffered from, can be adversely affected by handcuffs fastened too tightly.

In a similar vein, Plaintiff has pointed to no case in which handcuffing an obese person was found to be unconstitutional, and our subsequent research has uncovered no such case. Even accepting as true Plaintiff's assertion that only one set of handcuffs was used, Plaintiff has produced no evidence that this contributed to James's death. The light markings found on James's wrists less than a day after he was handcuffed simply do not support the inference that his handcuffs were excessively tight. *See Hanig v. Lee*, --- F.3d ----, 2005 WL 1661427 (8th Cir. Jul. 18, 2005) ("[A]llegations of pain as a result of being handcuffed, without some evidence of more permanent injury, are [not] sufficient to support [a] claim of excessive force.") (quoting *Foster v. Metro. Airports Comm'n*, 914 F .2d 1076 (8th Cir.1990)).

Plaintiff next argues that, even if handcuffing James was not excessive force, leaving him handcuffed after he began having trouble breathing was. Plaintiff bases this argument on a theory of positional asphyxiation. That is, Plaintiff disagrees that James died from a heart attack, instead believing her expert's opinion that James's breathing was lethally obstructed because of the manner in which he was handcuffed. (Pl.'s Resp. Defs.' L.R. 56.1 Stmt. ¶ 38.) However, Plaintiff has failed to connect a sufficient number of facts to raise a triable issue of fact regarding positional asphyxiation. Plaintiff has not supplied us with, nor could we locate, any source explaining positional asphyxiation that could support a finding that handcuffing a detainee with his hands

behind his back and leaving him to sit upright can cause death.

We reviewed case law in an effort to better grasp the relationship between restraint and asphyxiation. Every case broaching the subject this Court could locate deals with subjects who either had their legs and hands restrained, *e.g., Owens v. City of Atlanta*, 780 F.2d 1564 (11th Cir.1986); *Vizbaras v. Prieber*, 761 F.2d 1013 (4th Cir. 1985); *Price v. County of San Diego*, 990 F. Supp. 1230, 1237 (S.D.Cal.1998) (questioning theory of positional asphyxiation in relation to the hogtie restraint); or were left handcuffed in a prone position, *e.g. Young v. City of Mount Ranier*, 238 F.3d 567, 570 (4th Cir. 2001); *Wagner v. Bay City*, 227 F.3d 316, 323-24 (5th Cir.2000); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 594 (7th Cir.1997); *Cottrell v. Caldwell*, 85 F.3d 1480, 1488, 1491, 1492 (11th Cir.1996); or had weight such as a knee or foot on th, *e.g., Fernandez v. City of Cooper City*, 207 F. Supp. 2d 1371 (S.D. Fla. 2002). In many cases, a combination of these factors was involved.

Thus Plaintiff's only evidence that leaving James handcuffed after he had trouble breathing is the expert report and deposition testimony of Dr. Randolph Martin. Defendants object that Martin is a cardiologist and not an expert on asphyxiation. Plaintiff had the opportunity to address the objection but instead simply brushed it off as self-serving. A brief review of the doctor's report and testimony reveals that many of his findings are based on his knowledge as a cardiologist, which was necessary to rule out the findings of the coroner that a heart attack was the cause of death, and his research into positional asphyxiation. As neither side has provided the Court with sufficient information to fully evaluate the issue, we will not decide it at this time.

Even with the doctor's testimony, Plaintiff's claim must fail. His theory of positional asphyxiation in this case is not based on the act of handcuffing James. Rather, it is based on the

position of James's body once he slumped over in the back seat of Grace's squad car, still handcuffed. (Defs.' L.R. 56.1 Stmt. Ex. F at 47.) By no account were the officers responsible for placing James in this position. Plaintiff's excessive force claim is based on the manner in which the handcuffs were applied, given James's weight, not on the officers' reaction after his body involuntarily changed positions. The officers cannot therefore be said to have used excessive force causing positional asphyxiation. Summary judgment is granted with regard to the excessive force claim. Judged in the light most favorable to Plaintiff, the officers' actions could show a deliberate indifference to the fact that James lay prone and handcuffed in the squad car, a claim we will review next.

Medical Treatment

Plaintiff also charges that the officers violated James's constitutional rights by denying him proper medical care. Specifically, Plaintiff claims the officers showed deliberate indifference to his safety when they ignored his alleged complaint that he was ill and needed medicine, and when they failed to perform CPR to resuscitate him. While Plaintiff points to no cases that establish that the officers had a duty to perform CPR or other lifesaving measures after they called an ambulance, Defendants will nonetheless be denied qualified immunity where " a reasonable state actor would know that what he is doing violates the Constitution." *See Morrell v. Mock*, 270 F.3d at 1100. We find that, under the facts alleged by Plaintiff, qualified immunity should be denied for Plaintiff's deliberate indifference claim.

In order to prevail on this claim, Plaintiff has the burden to prove that James had a serious medical need and that Defendants were deliberately indifferent to it. *Wynn v. Southward*, 251 F.3d

588, 593 (7th Cir. 2001). A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation marks and citation omitted). "Deliberate indifference [is] . . . more than mere negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Defendants were deliberately indifferent only if they were "subjectively aware of [plaintiff's] serious medical needs and disregarded an excessive risk that a lack of treatment posed to [his] health or safety." *Wynn*, 251 F.3d at 593.

The officers were not on notice that when James allegedly told them "I don't feel good. I need my medicine" that James was expressing a serious medical need. Though he did not elaborate, the medication James apparently wanted was for his heart. (Defs.' L.R. 56.1 Stmt. Ex. D at 23.) However, when James began coughing in the squad car and showing signs of distress, the officers, having been alerted that James was not feeling well, might have inquired whether he was feeling better. (Pl.'s L.R. 56.1 ¶ 42.) Instead, even after James began coughing, Grace left the vehicle to place Eric under arrest. (Defs.' L.R. 56.1 Stmt. ¶¶ 24–25.) Though this may not have been enough in itself to show deliberate indifference, it is a piece of evidence that fits with a larger pattern.

The officers became aware of a serious risk to James's health when he slumped over in the back seat of the squad car. Whether their response was reasonable under the circumstances is a triable issue. The timing of events is in dispute, but according to Plaintiff's statement of facts, at most six and a half minutes elapsed between the first visible signs of James experiencing discomfort and the call for an ambulance. (Pl.'s L.R. 56.1 Stmt. ¶¶ 41, 42, 52.) These facts are based on a video

taken from inside Grace's squad car.[2] When the video is switched off, there is no indication that James has slumped over. (*See id.* ¶ 47.) The first call for paramedics was placed just over four minutes later. (*Id.* ¶ 48.) The second call, updating the seriousness of the situation, was placed one minute after the first. (*Id.* ¶ 52.) Eric's testimony confirms that Grace got out of the squad car, opened up the door nearest James, and attempted to arouse him after he had slumped over. (Defs.' L.R. 56.1 Stmt. Ex. D at 86.) Eric, who had been yelling for someone to help his father, could not gauge the time it took Grace to respond, but he testified it "seemed forever." Grace had an obligation to move fast to aid James once he was aware that he required medication and was having trouble breathing. Instead, six minutes passed before an ambulance was summoned.

Finally, after the paramedics were called, neither Grace nor Dowdle, who by this time had returned to the scene, attempted to perform CPR on James in the two to five minutes it took for the medical technicians to arrive. The officers were trained in CPR but said they thought he was breathing so it was unnecessary. Yet when the paramedics arrived, Grace and Dowdle were allegedly standing outside of the squad car with the doors closed, while inside James had already begun to turn blue. Leaving James inside the car, handcuffed, slumped over and non-responsive, for five minutes showed a reckless disregard of James's safety.

If a jury were to give credence to Plaintiff's version of the facts, it could well find that Defendants knowingly violated James's right to due process. Therefore, officers Grace and Dowdle are not entitled to qualified immunity from the Eighth Amendment claim of deliberate indifference. Moreover, material issues of fact abound about which a reasonable jury could disagree. Therefore,

---

[2]Plaintiff has asked us to draw all possible negative inferences from the fact that portions of the video seem to be missing. Plaintiff disputes Defendants' explanation that the tape was simply shut off prematurely, instead suggesting foul play. The only possible inference to be drawn from the evidence before the Court is that the officers failed to act quickly enough. That is the inference that we will examine.

summary judgment on this claim is denied.

On a final note, summary judgment in favor of all Defendants on Plaintiff's claim for a violation of statutory civil rights is granted. Plaintiff failed to properly enunciate the claim in her complaint. Summary judgment is denied on Plaintiff's claim of willful and wanton misconduct, in light of the issues discussed above.

### Conclusion

For the reasons set forth above, Defendants' motion for summary judgment are granted in part and denied in part. Summary judgment is granted for Counts II and III. All claims against Defendant Round Lake Beach Police Department are therefore dropped. Summary judgment is denied for Counts I and IV.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

**DATED:** JUL 2 1 2005